**CASE NUMBER 25-10654**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**RICARDO MCCLINTON and DORIS JONES,
as Surviving Parents and Co-Administrators of the
ESTATE OF JAMARI MCCLINTON, Deceased,**

Plaintiffs/Appellants

v.

**WARDEN WALTER BERRY, COUNSELOR JARVIS PRIMUS,
WARDEN JAMES KEVIN PERRY, ELADIO ABREU,
and LIEUTENANT NOLITA MOSS,**

Defendants/Appellees

---

ON DIRECT APPEAL FROM A FINAL ORDER
OF THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA

---

# BRIEF OF APPELLANTS

---

CRAIG T. JONES
Georgia Bar No. 399476
Craig T. Jones, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com
*Attorney for Appellants*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a)(2), the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

Abreu, Aladio

Berry, Walter

Carr, Hon. Christopher

Jones, Craig T. and Craig T. Jones, P.C.

Jones, Doris

Jones, Laura L.

McClinton, Ricardo

Moss, Nolita

Pacious, Kathleen

Perry, James Kevin

Peters, William

Pinkston-Pope, Loretta L.

Primus, Jarvis

2.

The undersigned further certifies that the following is a full and complete list of all other persons, associations of persons, firms, partnerships, or corporations having either a financial interest in or other interest which could be substantially affected by the outcome of this particular case:

Allied World Assurance Company (U.S.), Inc. (AWH)

Georgia Department of Administrative Services

Georgia Department of Corrections

Treadwell, Hon. Mark T.

*/s/ Craig T. Jones*
CRAIG T. JONES
Georgia Bar No. 399476
Counsel for Appellants

CRAIG T. JONES, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com

## **TABLE OF CONTENTS**

Certificate of Interested Parties and Corporate Disclosure Statement………...........2

Table of Contents……………………………………………………..………4

Table of Authorities…………………………………….....................................6

Statement Regarding Oral Argument……………………………………………7

Statement of Jurisdiction…………………………………………………......9

Statement of the Issues ……………………………………………………...10

Statement of the Case…………………………………………………………..11

      Nature of Case……………………………………………………………11
      Course of Proceedings and Dispositions in the Court Below………………12
      Statement of the Facts…………………………………………………14
      Standard of Review………….……………………………………......21

Summary of Argument ........................................ …………………………………22

Argument and Citations of Authority ................. …………………………………23

    A.   There a jury question as to whether the warden at Phillips State Prison, who kept the decedent in continuous protective custody for the four months preceding his transfer, was deliberately indifferent to a serious risk of harm when the warden failed to communicate the fact that the decedent had been in protective custody for four months when transferring him to Baldwin State Prison…………………………………………..27

    B.   There is a jury question as to whether the Department of Corrections classification analyst who approved the transfer because the decedent was in danger at Phillips State Prison acted with deliberate indifference to a serious risk of harm when he failed to take steps to continue protective custody or otherwise ensure the safety of the decedent upon arrival at Baldwin State Prison……………………………………………………….30

    C.   There is a jury question as to whether the receiving warden at Baldwin State Prison was deliberately indifferent to a serious risk of harm by failing to make arrangements to continue the protective custody that he had been on at Phillips State Prison, which was the very reason for his transfer to Baldwin……………………………………………………31

D.      There is a jury question as to whether the counselor at Baldwin State Prison who did the intake on the decedent acted with deliberate indifference to a serious risk of harm by failing to make arrangements to continue the protective custody that he had been on at Phillips State Prison, which was the very reason for his transfer to Baldwin…………33

E.      There is a jury question as to whether a lieutenant in charge of security at Baldwin State Prison was deliberately indifferent to a serious risk of harm when she was aware of requests by the decedent to be placed in protective custody there but failed to take appropriate action on those requests, which she admittedly failed to document, as well as a credibility issue as to her claim that she took no action because the decedent withdrew those requests and the decedent is not alive to refute that claim………………34

F.      The trial court erred by declining to apply a Georgia statute tolling the limitations period for personal injury claims to a federal civil rights claim for wrongful death, and the Court should certify the interpretation of that statute (O.C.G.A. §9-3-99) to the Supreme Court of Georgia…………..38

Conclusion………………………………………………………………………...44

Certificate of Compliance…………………………………………………….....44

Certificate of Service……………………………………………………………...45

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Bd. of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478 (1980)……………..…38

*Benjamin v. Thomas*, No. 1:16-cv-1632-WSD,
    2016 U.S. Dist. LEXIS 132575 (N.D. Ga. Sep. 27, 2016)…………………38

*Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961)………………………………….38

*Farmer v. Brennan*, 511 U.S. 825 (1994)………………………...………21-25, 35-36

*Harrison v. McAfee*, 338 Ga. App. 393, 388 S.E. 2d 872) (2016)…………………40

*Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995)……………………………21

*Hicks v. Universal Health Services, Inc.*,
    364 Ga. App. 769, 874 S.E. 2d 877 (2022)………………………………40-41

*Hope v. Pelzer*, 536 U.S. 730 (2002)………………………………….………..25

*Johnson v. Bd. of Regents,* No. 5:06-cv-366 (WLS),
    2007 U.S. Dist. LEXIS 71983, (M.D. Ga. Sep. 27, 2007)…………………37

*Marsh v. Butler County, Ala.*, 268 F. 3d 1014 (11th Cir. 2001) (*en banc*)………..22

*McCullough v. Antolini*, 559 F.3d 1201 (11th Cir. 2009)………………………...35

*Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013)……………………………35

*Owens v. Okure*, 488 U.S. 235 (1989)……………………………………………37

*Robertson v. Hecksel*, 420 F.3d 1254 (11th Cir. 2005)…………………………...39

*Shaw v. Peach Cty.*, No. 5:21-cv-00145-TES,
    2021 U.S. Dist. LEXIS 175088 (M.D. Ga. Sep. 15, 2021)………………...38

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)………………………………25

*Wade v. McDade*, 106 F. 4th 1251 (2024) (*en banc*)……………..…7, 21, 23-25, 36

*Wallace v. Kato*, 549 U.S. 384 (2007)…………………………………………37

*Wilson v. Garcia*, 471 U.S. 261 (1985)…………………………………..37-38

*Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986)…………………37

*Zatler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986)……………………………..22

STATUTES AND CONSTITUTIONAL PROVISIONS

Eighth Amendment…………………………………………………7, 11, 21, 24

28 U.S.C. §1291…………………………………………………………………9

28 U.S.C. §1331…………………………………………………………………8

42 U.S.C. §1983…………………………………………8, 11, 37-39, 41-42

O.C.G.A. §9-3-92………………………………………………………………..40

O.C.G.A. §9-3-99……………………………………………….10, 36, 38, 40-41

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe oral argument would be beneficial to the Court and the Bar because this case turns on a misapplication of the Court's recent decision in *Wade v. McDade*, 106 F. 4th 1251 (2024) (*en banc*), which was a well-intentioned effort to clarify the definition of "deliberate indifference" in Eighth Amendment cases by resolving semantic differences between divergent lines of authority so as to be consistent with the thirty-year-old Supreme Court precedent that it purported to follow.  Unfortunately, the *Wade* decision has interpreted by the court below and others as changing the deliberate indifference standard from a two-part standard with both an objective and subjective component to one in which both components now appear to be subjective – at least in the way it has been applied in this case and others.  Appellants hope this case will enable the Court to improve upon its decision in *Wade* so it will be better understood in the various contexts in which an Eighth Amendment claim can arise, and to prevent it from being mischaracterized as a one-size-fits-all definition of deliberate indifference for all claims whether they involve denial of medical care, failure to protect, or other violations without regard for the factual context or constitutional Amendment under which they arise.

This case also reviews an interlocutory ruling on the application of a statute of limitations tolling provision under state law which has not yet been addressed by the Georgia Supreme Court of Georgia, who Appellants respectfully submit should

be asked for its interpretation before this appeal is decided. Appellants believe that the trial court's interpretation of the tolling provision applicable to victims of crime, while consistent with a single panel decision of the state's intermediate appellant court in another context, is inconsistent with the remedial purpose of Section 1983 and its exclusive reliance upon state law tolling rules for generic personal injury claims. Even where the loss claimed is to life, liberty, or property and is not a personal injury claim *per se*, the Supreme Court has made clear that Section 1983 borrows the state law limitations and tolling provisions applicable to personal injury claims; for that reason, federal civil rights claims involving death should not be time-barred because of differences in the way state law treats personal injury and wrongful death cases.

Because of the importance of these issues under both state and federal law, the potential for the decision in this case to impact other cases involving those issues, and Appellants' belief that a dialogue between Court and counsel would aid the decisional process, oral argument is hereby requested.

## STATEMENT OF JURISDICTION

**A.    Basis for District Court's Subject Matter Jurisdiction.**

The District Court had subject matter jurisdiction over the instant case pursuant to 28 U.S.C. §1331.

**B.    Basis for Appellate Court's Subject Matter Jurisdiction.**

This is a direct appeal from a final judgment of the District Court, for which this Court has subject matter jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

A. Is there a jury question as to whether the warden at Phillips State Prison, who kept the decedent in continuous protective custody for the four months preceding his transfer, was deliberately indifferent to a serious risk of harm when the warden failed to communicate the fact that the decedent had been in protective custody for four months when transferring him to Baldwin State Prison?

B. Is there a jury question as to whether the Department of Corrections classification analyst who approved the transfer because the decedent was in danger at Phillips State Prison acted with deliberate indifference to a serious risk of harm when he failed to take steps to continue protective custody or otherwise ensure the safety of the decedent upon arrival at Baldwin State Prison?

C. Is there a jury question as to whether the warden at Baldwin State Prison acted with deliberate indifference to a serious risk of harm when he accepted the transfer of Appellants' decedent from Phillips State Prison without making arrangements to continue the protective custody that he

had been on for the past four months due to an altercation with a high-ranking gang leader that had led to a bounty being put on their son's head that was communicated to gang members across the prison system?

D. Is there a jury question as to whether the counselor at Baldwin State Prison who did the intake on the decedent acted with deliberate indifference to a serious risk of harm by failing to make arrangements to continue the protective custody that he had been on at Phillips State Prison, which was the very reason for his transfer to Baldwin?

E. Is there a jury question as to whether a lieutenant in charge of security at Baldwin State Prison was deliberately indifferent to a serious risk of harm when she was aware of requests by the decedent to be placed in protective custody there but failed to take appropriate action on those requests, which she admittedly failed to document, as well as a credibility issue as to her claim that she took no action because the decedent withdrew those requests and the decedent is not alive to refute that claim?

F. Did the trial court err by declining to apply a Georgia statute tolling the limitations period for personal injury claims to a federal civil rights claim for wrongful death, and should this Court certify the interpretation of that statute (O.C.G.A. §9-3-99) to the Supreme Court of Georgia?

## STATEMENT OF THE CASE

### Nature of Case

This is a direct appeal from a grant of summary judgment in a federal civil rights action against correctional officers and administrators for deliberate indifference to a known risk of serious harm to a particular inmate which resulted in the inmate being murdered, for which his parents have filed an Eighth Amendment claim under 42 U.S.C. §1983.  Appellants have also appealed an interlocutory ruling that the statute of limitations was not tolled by O.C.G.A. §9-33-99 to the extent that damages are being sought for their son's death, for which they have contemporaneously filed a motion requesting certification to the Georgia Supreme Court.

### Course of Proceedings and Disposition in the Court Below

This case was originally filed on December 1, 2021 by the parents of Jamari McClinton against the Georgia Department of Corrections (GDC) and its Commissioner in the Superior Court of Fulton County to find out the circumstances of their son's death, since the GDC was unwilling to produce such information under the Georgia Open Records Act in light on the ongoing investigation into the subject murder.  After being sued under the Open Records Act, the GDC produced enough records to convince Plaintiffs/Appellants to dismiss their state law case and refile the instant action in federal court.

On March 14, 2022, Plaintiffs/Appellants Doris Jones and Ricardo McClinton filed their Complaint in the Middle District of Georgia against Warden Berry and Counselor Primus at Baldwin State Prison where their son had been murdered. (R. 1). Those Defendants filed their Answer on June 28, 2022 (R. 4). On November 3, 2022, the parties filed a joint motion to stay discovery because the ongoing criminal prosecution limited their access to essential evidence and witnesses, which was granted by the court on November 7, 2022. (R. 7, 8). On September 13, 2023, the parties jointly moved for the stay to be lifted, and on the following day the court entered an Order lifting the stay and extending the discovery period. (R. 13, 14)

Based on information obtained through discovery, Plaintiffs/Appellants filed a motion for leave to amend to add additional Defendants (Warden Perry at Phillips State Prison, GDC classification analyst Aubreu, and Lt. Moss at Baldwin) which was granted on April 4, 2024. (R. 30). Defendants/Appellees filed a motion to dismiss the Amended Complaint on June 6, 2024 (R. 36), which was granted in part and denied in part on September 25, 2024 (R. 50). That interlocutory Order is one of the rulings addressed by this appeal. (R. 66).

While waiting for a ruling on their motion to dismiss, Defendants/Appellees filed a motion for summary judgment on September 16, 2024 to meet the deadline for dispositive motions, as well as a *Daubert* motion to exclude the testimony of

Plaintiffs' expert, a former Deputy Director of the Federal Bureau of Prisons. (R. 46, 47). Plaintiffs/Appellants filed timely responses in opposition to both motions. (R. 48, 52). On February 13, 2025, the trial court entered an Order granting the motion for summary judgment and denying the motion to exclude Appellants' highly qualified expert as moot. (R. 63). On February 14, 2025, the court entered a Judgment terminating the case and making the September 25 interlocutory Order (R. 50) directly appealable. (R. 64). Appellant filed a Notice of Appeal to this Court from the Judgment (R. 64) and both Orders (R. 50, 63) on February 27, 2025. (R. 66).

## **Statement of the Facts**

On April 18, 2021, Plaintiffs' son Jamari McClinton was an inmate at Phillips State Prison who made a complaint accusing another inmate of sexually assaulting him. (R. 52-1 at 5, ¶26).[1] On April 19, 2021, McClinton was involved in an altercation resulting from the sexual assault allegation in which he stabbed a high-ranking Bloods gang member named Michael Johnson. (*Id.* at ¶23). As a result of the altercation, Mr. McClinton was placed in disciplinary segregation. According to Mr. McClinton's Movement History report, his status was changed to Protective Custody on April 22, 2021 by Warden Perry due to the likelihood that

---

[1] The background facts summarized here are articulated by Appellants' correctional expert based his review of the very same records that were available to Appellees in making the decisions that led to McClinton's death. (R. 52-1, 52-2).

Mr. Johnson would seek retaliation against Mr. McClinton. (*Id.* at ¶24).

After four months in Protective Custody at Phillips, McClinton was transferred to Baldwin State Prison in Milledgeville, Georgia on August 6, 2021. (*Id.* at ¶25). On August 11, 2021, Mr. McClinton was stabbed to death by another inmate at Baldwin. (*Id.*) Before Mr. McClinton's transfer to Baldwin, Phillips Warden Kevin Perry was actively involved in his case and had knowledge of the risk of harm to McClinton, which is clear from Case Notes entries made by Perry. (*Id.* at 6-7, ¶¶29-30). During his deposition, Warden Perry stated he placed Mr. McClinton in involuntary protective custody because he felt Mr. McClinton was in danger at Phillips State Prison. (R. 60 at 9-10).

Based on his own appreciation for the risk of violent retribution against McClinton after the incident with Michael Johnson, Perry put McClinton in involuntary protective custody and never took him off involuntary protective custody because Michael Johnson was still at Phillips State Prison. (*Id.*). It being the experience of Plaintiffs' expert that inmates are typically put in involuntary protective custody by the security staff, "Warden Perry's personal involvement and decision to place Mr. McClinton in involuntary protective custody shows the extent to which Warden Perry was aware of a threat to Mr. McClinton's safety." (R. 52-1 at 7, ¶30).

Warden Perry knew that Michael Johnson was a gang leader and had a well-

founded concern for McClinton's safety because it is a known fact that "offenders who assault a gang leader – even if they are members of the [same] gang – will face severe retaliation for such an assault," and Warden Perry was clearly aware of that fact. (*Id.* at ¶31). When asked about threats to Mr. McClinton's safety if he were transferred to another prison, Warden Perry provided conflicting testimony which needs to be evaluated by a jury. While he initially stated, "I didn't feel like he [McClinton] was in imminent danger at another facility since he was away from Michael Johnson" (R. 60 at 31), he later acknowledged there would still be a risk of harm to Mr. McClinton even if he were transferred to another prison:

> So I mean I guess it would be safe to say, yeah, anytime you've stabbed an offender while you've been incarcerated or whatever, the possibility of a threat is going to always be, it's going to always be a possibility. And does that increase because it was a high-ranking Blood member or whatever, then looking at it from that standpoint, obviously I'll have to say it was a possibility.

(*Id.* at 32).

While Warden Perry indicated that the Georgia Department of Corrections (GDC) does not have a robust policy and procedures to carefully evaluate prison locations where an offender can be assigned after involvement in an altercation that could result in retaliation, he stated that in circumstances when he is a aware of a threat of gang related "hit" or contract price being placed on a prisoner's head, he would typically reach out to the warden at the receiving facility. (*Id.* at 33).

But Warden Perry took no such action in Mr. McClinton's case, even though

it would have been reasonable for him to contact the warden at Baldwin State Prison and let him know Mr. McClinton had assaulted Michael Johnson, a high-ranking Bloods member. (R. 52-1 at 8, ¶34). GDC records from Phillips documented the reason for the transfer as follows:

> Per DW Billings, please transfer inmate McClinton to a facility with MH level 3 services. He cannot come out on the compound because of a known enemy. The enemy is identified as Johnson, Michael GDC#1000386449, a high-ranking Blood member whom inmate McClinton assaulted with a weapon.

(*Id.* at 9-10, ¶39).

The transfer request was reviewed and approved by Eladio Abreu, a Classification Analyst in the GDC's central office, who was responsible for reviewing and approving all medical and mental health transfers from one prison to another. (R. 57 at 5, 9). Mr. Abreu described the process for requesting inmate transfers as follows: (1) prisons submit their transfer requests through a computer platform known as SCRIBE; and (2) a classification specialist such as himself reviews the information in the transfer request and determines a suitable facility to which the offender may be transferred. (*Id.* at 10-14).

In making such a determination, Mr. Abreu stated he reviews mental health and security concerns when reviewing transfer requests. (*Id.* at 28-34). Mr. Abreu also stated he would consider the location of Michael Johnson and other enemies posing a danger to McClinton, acknowledging that Johnson could be associated

with Bloods gang members "in all of the prisons." (*Id.* at 33-34). When asked if he would leave it up to the receiving institution to take precautions to protect Mr. McClinton from Bloods gang members, Mr. Abreu simply stated, "That's a security function." (*Id.* at 34).

Plaintiff's expert, former BOP Deputy Administrator Chris Eichenlaub, testified that "determining where an offender like Mr. McClinton can be safely housed requires careful collaboration between classification staff with medical/mental health expertise and classification staff with security and gang expertise," but "Mr. Abreu did not collaborate with classification staff who had expertise in security and gangs when he made the decision to send Mr. McClinton to Baldwin State Prison." (R. 52-1 at 12, ¶48). Mr. Eichenlaub further testified that "Mr. Abreu was aware of the risk to Mr. McClinton's safety and it would have been reasonable to seek information from classification staff with security and gang expertise," but instead of doing what was reasonable, "Abreu simply determined Baldwin State Prison was an appropriate facility for Mr. McClinton and placed the onus for assessing Mr. McClinton's security concerns on staff at Baldwin State Prison. (*Id.* at ¶¶48-49).

Abreu conceded that it was "a given" that he should communicate his security concerns to the staff at Baldwin, but the only communication he had with the staff at Baldwin was the scant information provided in the comments section of

the approved transfer request which characterized it as a mental health transfer. (R. 57 at 35). Accordingly, "Mr. Abreu's failure to communicate directly with staff at Baldwin State Prison did not afford the facility an opportunity to fully assess Mr. McClinton's need for protection from Michael Johnson's associates in the Bloods gang." (R. 52 at 12, ¶49).

There is also no indication that staff at Baldwin State Prison reviewed the circumstances at Phillips State Prison that led to McClinton's transfer, and when asked if wardens are supposed to be consulted about their facility's ability to accommodate an offender under consideration for transfer to that facility, Warden Berry at Baldwin responded, "Not all the time. It depends on what kind of move it is." (R. 54 at 18). According to Warden Berry, "if it's an urgent transfer and it's a disciplinary transfer and somebody's coming to you on a negative point, then that – then the warden's [sic] will get – the warden will talk and say, I got this inmate coming over here. This is what's going on with this inmate. But that never happened in this case." (Id. at 42).

According to Appellants' expert Eichenlaub,

It is a best practice in corrections to conduct a comprehensive interview with an offender and documentation review upon his arrival in a new facility and prior to his placement in general population. There is no indication such a procedure was followed upon Mr. McClinton's arrival at Baldwin State Prison… [even though] "GDC's Offender Orientation policy indicates newly arrived offenders will be placed in an Admission and Orientation housing unit until intake and orientation is completed. Mr. McClinton was not placed in such a

housing unit; instead, he was placed directly into a general population housing unit for offenders classified Mental Health 3. … Mr. McClinton's direct placement into a mental health general population housing unit without the benefit of intake and orientation placed him at risk.

(R. 52 at 16, ¶¶60-61).

The Case Notes Entries for McClinton indicate that Counselor Jarvis Primus completed Mr. McClinton's intake and orientation on August 9, 2021. The superficial screening and orientation took place three days after Mr. McClinton's arrival at Baldwin State Prison, and it consisted of nothing more than a short conversation lasting one or two minutes. (R. 55 at 14). Counselor Primus made no effort to inquire about incidents at previous facilities, gang associations, or threats to Mr. McClinton's safety. Counselor Primus' one or two-minute conversation with Mr. McClinton was insufficient and placed Mr. McClinton at risk in Baldwin State Prison. (R. 52-1 at 16, ¶61). If that risk was not obvious from the computer screen in front of him, it was available at the push of a button.

On August 10, 2021, the Correctional Officer assigned to Mr. McClinton's housing unit, Krystle Milner, heard him knocking on the door of his housing unit. When she opened the door, Mr. McClinton was so desperate to leave he pushed her out of the way. In a prison environment, an offender pushing a correctional officer is taboo. Officer Milner asked Mr. McClinton to explain his behavior and according to Officer Milner he stated, "I got to get out of the dorm. I did

something to an offender at another institution, and we're in the same dorm together." (R. 59 at 7).

Officer Milner followed proper procedure and sent McClinton and his property to see her supervisor, Defendant Nolita Moss.  But Lt. Moss, while admitting that she feared for McClinton's safety based on what he told her, failed to document the encounter as required by policy.  (R. 59 at 18-19, ¶¶68-69; R. 58 at 21).

The pattern of deliberate indifference displayed by Defendants/Appellees in this case is consistent with a pattern in the GDC as a whole which was identified by a report of the Department of Justice released on October 1, 2024 which is subject to judicial notice because it is on an official Government website: findings_report_-_investigation_of_georgia_prisons.pdf (justice.gov).  Viewing the above facts in the light most favorable to the nonmoving party, Plaintiffs/Appellants are entitled to a jury trial on the issue of whether any or all Defendants were deliberately indifferent to that risk given the presence of gangs at all prisons, the ability of gang members to communicate between prisons, and the grim reality of the digital age that the influence of gang leaders does not stop at prison walls.

**<u>Standard of Review</u>**

This Court reviews the decision to grant summary judgment *de novo*,

applying the same legal standards which bound the district court. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). Because the grant of summary judgment terminated the case in the trial court, the Court also has jurisdiction to review interlocutory rulings of the court below for errors of law.

## SUMMARY OF ARGUMENT

It is clearly established law that prison officials have a constitutional duty to protect those in their custody from a known risk of serious harm posed by other prisoners, and that deliberate indifference to that risk is an actionable Eighth Amendment violation. There is a jury question in this case as to whether all the Defendant prison officials had actual knowledge that Jamari McClinton was at risk of serious harm – which was the reason for his transfer from one prison to another to begin with – and as to whether they made a conscious decision not to act on that knowledge. If any of the Defendants are able to show a lack of such knowledge, that would be consistent with a finding that other Defendants who did possess actual knowledge of the risk failed in their duty to pass that information those Defendants who plead ignorance of the risk. In other words, there is a genuine issue of material fact as to whether each of the Defendants/Appellees named in this case violated the Eighth Amendment deliberate indifference standard for failure-to-protect cases – established by *Farmer v. Brennan*, 511 U.S. 825 (1994) and reiterated by *Wade v. McDade*, 106 F. 4th 1251 (2024) (*en banc*) – as to either its

subjective component of actual knowledge, its objective component of failing to act on that knowledge, or both.  Accordingly, the case should proceed to trial against those Defendants as to whom both components are satisfied when the evidence of each component is viewed in the light most favorable to Plaintiffs/Appellants.

## ARGUMENT AND CITATION  OF AUTHORITY

Thirty years ago, the Supreme Court ruled in a case of assault on a transgender inmate that prison officials act with deliberate indifference to the rights of a prisoner when there is "a substantial risk of serious harm, of which the official is subjectively aware, … and the official does not respond reasonably to the risk" ); *Farmer v. Brennan*, 511 U.S. 825, 844 (1994); *see also Marsh v. Butler County, Ala.*, 268 F. 3d 1014, 1028 (11th Cir. 2001) (*en banc*) (quoting that language and applying  same  standard  to  pretrial  detainees.   Even  before  that,  this  Court recognized that "it is well settled that a prison inmate has a constitutional right to be protected…from physical assault by other inmates." *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986).

In *Marsh*, the full Court defined "deliberate indifference" as where there is "a substantial risk of serious harm, of which the official is subjectively aware, … and the official does not respond reasonably to the risk." The element that "the official does not respond reasonably to the risk" does not equate to negligence

because the risk is known, whereas negligence is based on what a reasonable person should have known. Unfortunately, a more recent *en banc* decision has, perhaps unintentionally, muddied the water despite being intended to clear up discrepancies between the definition of 'deliberate indifference' between those cases and others which – in defense of those decisions – arose in a variety of factual contexts which are not always conducive to a single overarching definition. *Wade v. McDade*, 106 F. 4th 1251 (11th Cir. 2024).

*Wade* is best understood as a judicial housekeeping decision intended to resolve a semantic split in authority rather than a wholesale rewriting of more than 30 years of clearly established law. The semantic issue which the Eleventh Circuit sought to resolve in *Wade* was whether the two-part deliberate indifference standard established by *Farmer v. Brennan*, 511 U.S. 825 (1994), requires conduct that equates to "recklessness," "gross negligence," or – as simply stated in *McElligot v. Foley*, 182 F. 3d 1248 (11th Cir. 1999) – "more than negligence." But as is often the case in our adversarial system, the courts' best attempts to clarify the law are often used as an excuse to muddy the water and argue that the law is now less clear.

*Wade v. McDade* was a denial of medical care decision which stated explicitly in its opening paragraph that it was reiterating *Farmer v. Brennan* to clarify ambiguous wording in Eleventh Circuit decisions which have on occasion

phrased the definition differently in differing contexts. Despite the trial court's acknowledgement that "it is far from certain that *Wade* abrogated all Eighth Amendment deliberate indifference precedent, particularly for failure to protect cases," it nonetheless appears that the trial court has taken an overly restrictive view of the deliberate indifference standard in this case that it would not have taken had *Wade* not been decided, and which is inconsistent with the Supreme Court's seminal decision in *Farmer*. (R. 63 at 12).

That inconsistency is clearly demonstrated by the trial court's previous ruling on Plaintiffs' motion to amend (R. 50), in which the court ruled that the Complaint did properly allege a claim of deliberate indifference against the newly added Defendants – even though the facts since adduced through discovery are insufficient to bring that claim to trial thanks to what a subheading in the summary judgment Order calls "the impact of *Wade v. McDade*." (R. 63 at 12). Thirty-year-old law that the trial court deemed to be clearly established at the pleadings stage in September 2024 (R. 50) – and which a reasonable prison official would have been expected to understand at the time of McClinton's murder in 2021 – was suddenly no longer clearly established just five months later at the summary judgment stage in February 2025, despite the fact that most (but not all) of the allegations pled in the Amended Complaint were now supported by sworn

testimony and documentary evidence.[2]  The issue in this case is what a reasonable prison official would have thought the law to be at the time of the alleged deliberate indifference in 2021 – which the trial court already ruled was sufficient to establish a constitutional violation at that time – and not what a crystal ball might allow an official to get away with if he knows the law is going to change in three years.

*Wade v. McDade* was not intended to rewrite longstanding, clearly established law,[3] but was a well-meaning attempt to clarify semantic differences

_____

[2] The undersigned counsel acknowledges that not all the facts as alleged were proven through discovery – for example, the assertion that Defendants/Appellants were aware of the $6,000 bounty offered to gang members for the killing of McClinton.  However, their knowledge of the general risk of gang violence faced by McClinton in view of his recent history of conflict with gang members—which necessitated his protective custody at one prison and the decision to transfer him to another when there was general knowledge of gang presence at all prisons – nonetheless authorizes an inference of actual knowledge of a *risk* of serious harm. It is enough to show a risk of harm, not a certainty.

[3] This brief says little about qualified immunity, which is safely relegated to a footnote because the trial court's decision turned on whether there was an underlying constitutional violation in the first place and not on whether the precedent relied on by Appellants applies with obvious clarity to the facts of this case, although it does.  *See, e.g., Hope v. Pelzer*, 536 U.S. 730 (2002) (factually similar precedent not required where rule is stated with sufficient particularity to apply to a variety of fact patterns); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (a judicial decision clearly establishes the law if its holding is articulated in a way which is not limited to the litigated facts).  However, Appellants' counsel (who argued *Hope* both here and in the Supreme Court) may have more to say in a reply brief or oral argument should the focus turn from the legal standard required to establish a constitutional violation in the first place to a swearing match about the degree of similarity between this case and clearly

between two lines of authority on whether deliberate indifference means 'more than negligence' or 'more than gross negligence.' But what has long been expressed as a two-part standard for deliberate indifference – one part subjective (actual knowledge of a risk of serious harm) and one part objective (failure to act reasonably upon that knowledge) – is now being applied by the trial court and others in a way that both parts are arguably subjective (actual knowledge of both the risk *and* of the harm that will result from failing to act on it). Because neither courts nor juries are mind readers, that level of culpability can rarely be proven in the absence of a confession that the defendant not only knew, but knew *better*, to the point that intent can be inferred. The standard is deliberate *indifference*, not deliberate intent.

Viewing the facts in chronological order, and in the light most favorable to Appellants through the lens of clearly established law in 2021, the trial court decision should be reversed for the reasons discussed below.

---

established precedent. In any event, the facts and issues in this prison murder case are much more similar to those in *Farmer* (a prison assault case) than *Wade* (a denial of medical care case where a higher degree of culpability is arguably required to hold prison staff without medical training liable for failing to appreciate the seriousness of an inmate's medical condition).

**A. There a jury question as to whether the warden at Phillips State Prison, who kept the decedent in continuous protective custody for the four months preceding his transfer, was deliberately indifferent to a serious risk of harm when the warden failed to communicate the fact that the decedent had been in protective custody for four months when transferring him to Baldwin State Prison.**

Warden Perry himself testified that he was aware of the risk of harm that gang leader Michael Johnson posed to Jamari McClinton, which was why he kept McClinton in involuntary protective custody during his last four months at Phillips. (R. 60 at 9-10). According to Plaintiffs' expert,

> Based on my experience, offenders are placed in involuntary protective custody by security staff. Warden Perry's personal involvement and decision to place Mr. McClinton in involuntary protective custody shows the extent to which Warden Perry was aware of a threat to Mr. McClinton's safety.

(R. 52-1 at 7, ¶30). While Warden Perry says he was not aware of any specific threat of gang retaliation facing McClinton at another prison, he did acknowledge under oath that simply moving him to another prison without communicating the need for him to remain in protective custody would not necessarily protect him from violence at the receiving prison, admitting it was "going to always be a possibility" that would obviously "increase because it was a high-ranking Blood member" who wanted him dead. (R. 60 at 32). Appellants cannot get inside Perry's head but are entitled to reasonable inferences that can be drawn about someone in his position under the circumstances. The trial scoffed at that notion:

> *Perhaps if Warden Perry knew where Jamari would be sent <u>and if</u> he knew that Bloods were active there <u>and if</u> he had reason to believe that Johnson could coordinate with Bloods at that prison,[4] <u>and if</u> he knew that the receiving prison might not act on information in the transfer paperwork detailing the danger Jamari faced, then <u>perhaps</u> the plaintiffs could plausibly argue that Warden Perry was subjectively aware of a substantial risk of serious harm to Jamari.* But that evidence is not in the record. For example, although reports of gang influence and control of GDC facilities may seem common, the record here does not establish that and there is no evidence that Warden Perry knew that because of gang dominance moving Jamari to another prison put him at a substantial risk of serious harm.

(R. 63 at 14-15) (emphasis added to stress what counsel respectfully submits is the tenuousness of that proposition). Because Warden Perry had general knowledge that all those things could happen since McClinton was actually in protective custody at Perry's prison the entire time he was making arrangements for the transfer, the question of whether he in fact knew that McClinton was at a continued risk of serious harm ought to be decided by the jury and not the court.

It cannot be said as a matter of law that a warden who has placed someone in continuous protective custody for fear of gang violence can simply transfer that person to another prison without communicating the concerns behind that transfer to the receiving warden to ensure the continuity of that protection. According to

---

[4] However, Perry also said "I can't say that inmates don't communicate with other facilities or whatever" because "[u]nfortunately they have cell phones or whatever, so no way I could say what could not happen." (R. 60 at 31). And he also could not rule out the possibility that gang retaliation at the receiving prison. (Id. at 28-34). Whether that means it was a known risk – lying somewhere between speculative possibility and predictable certainty – is a matter of weight, credibility, and common sense to be determined by the jury with the witness in front of them.

Plaintiff's expert,

> Warden Perry stated in circumstances when he is aware of a threat, a hit, or a price on a prisoner's head, he would reach out to the warden at the receiving facility. In Mr. McClinton's case it would have been reasonable for Warden Perry to contact the warden at Baldwin State Prison to let him know Mr. McClinton had assaulted Michael Johnson, a high-ranking Bloods member. But Warden Perry took no such action.

(R. 52-1 at 8, ¶34). That should be enough to get to a jury on the question of whether Warden Perry acted reasonably for a prison administrator with actual knowledge of a *risk* of serious harm, whether that risk was a certainty or not.

**B. There is a jury question as to whether the Department of Corrections classification analyst who approved the transfer because the decedent was in danger at Phillips State Prison acted with deliberate indifference to a serious risk of harm when he failed to take steps to continue protective custody or otherwise ensure the safety of the decedent upon arrival at Baldwin State Prison.**

The classification analyst responsible for assigning McClinton to Baldwin was Defendant Abreu, who acknowledged that the high-ranking Bloods gang leader who posed a danger to Johnson could be associated with Bloods members "**in *all* of the prisons**." (R. 57 at 34) (emphases added). "When asked if he would leave it up to the receiving institution to take precautions to protect Mr. McClinton from Bloods gang members, Mr. Abreu simply stated, 'That's a security function.'" (R. 52-1 at 11-12, ¶47; R. 57 at 34). "[D]etermining where an offender like Mr. McClinton can be safely housed requires careful collaboration between classification staff with medical/mental health expertise and classification staff

with security and gang expertise." (R. 52-1 at 12, ¶48). Yet Abreu made no effort to coordinate with the security staff at Baldwin and made a unilateral decision to transfer McClinton to Baldwin, which "did not afford the facility an opportunity to fully assess Mr. McClinton's need for protection from Michael Johnson's associates in the Bloods gang." (*Id.* at ¶49). Because Abreu failed to do what an expert says should given his knowledge of the security risk presented by the McClinton transfer, reasonable jurors could find that he was deliberately indifferent to that risk. That is particularly true given that the transfer paperwork he generated gave the false impression that the transfer was solely for mental health purposes and Abreu did nothing to clarify that information for the benefit of the receiving prison. (*Id.* at pp. 12-13, ¶50). Which would explain why he was placed in a mental health ward upon arrival at Baldwin rather than being properly vetted for protective custody. (R. 52-1 at 16, ¶62).

**C. There is a jury question as to whether the receiving warden at Baldwin State Prison was deliberately indifferent to a serious risk of harm by failing to make arrangements to continue the protective custody that he had been on at Phillips State Prison, which was the very reason for his transfer to Baldwin.**

McClinton was transferred to Baldwin the day after the approval of the transfer by Abreu, and Warden Berry at Baldwin received no information about McClinton or the reasons for the transfer until after he was killed. Normally such communications occur prior to arrival but that did not occur in this case. (R. 54 at

18, 42). Based upon the paperwork accompanying his arrival he was placed in a mental health dorm but not in protective custody. (R. 52-1 at 16, ¶62). In the words of Plaintiffs' expert based on his review of GDC policy,

> GDC's Offender Orientation policy indicates newly arrived offenders will be placed in an Admission and Orientation housing unit until intake and orientation is completed. Mr. McClinton was not placed in such a housing unit; instead, he was placed directly into a general population housing unit for offenders classified Mental Health 3… Mr. McClinton's direct placement into a mental health general population housing unit without the benefit of intake and orientation placed him at risk.

(R. 52-1 at 16, ¶61). The required intake and orientation did not take place until three days later, which meant that there was three days' less time to evaluate the circumstances and take the necessary steps to continue McClinton's protection from the risk of gang violence that had prompted his transfer in the first place.

Reasonable jurors could infer that Warden Berry was responsible for making sure that GDC policy was followed at his facility, both as to intake and orientation as well as to documentation of requests for protective custody which policy required him to review and approve, and that his failure to keep his ship in order was a but-for cause of this tragic but foreseeable event.[5] However, counsel

---

[5] Counsel concedes that Warden Berry's liability is a much closer question than that of the other Defendants. While Mr. Eichenlaub's expert report clearly opines that Perry (the warden at Phillips), Abreu (the central office classification officer), Primus (the counselor at Baldwin), and Moss (the lieutenant at Baldwin) all had actual knowledge of a risk and the potential for a bad outcome, his only criticism of Warden Berry at Baldwin is that he was kept in the dark about McClinton by

recognizes that inferring actual knowledge from circumstantial evidence – in this case, a warden's failure to recognize and correct a systemic problem that should have been obvious to someone in his position given his knowledge of the "bad" things that happen "all the time" at his prison – is a tall order, and if any Defendant is entitled to summary judgment it would be Warden Berry.  (R. 54 at 7).  If the proverbial baby must be split, the line should be drawn between Berry and everyone else, for whom there is both direct evidence of their knowledge and circumstantial evidence of deliberate indifference to that knowledge.

**D. There is a jury question as to whether the counselor at Baldwin State Prison who did the intake on the decedent acted with deliberate indifference to a serious risk of harm by failing to make arrangements to continue the protective custody that he had been on at Phillips State Prison, which was the very reason for his transfer to Baldwin.**

Not only was there an unreasonable delay in McClinton's orientation upon arrival at Baldwin, but the counselor who did the orientation, Defendant Primus, failed to collect the necessary information required by GDC policy.  There was nothing more than a superficial conversation with no inquiry into history or security issues, which Plaintiffs' expert characterizes as "a complete disregard for

---

Phillips, the central office, and his own subordinates.  (R. 52-1 at 51-55).  That is consistent with Berry's own affidavit that he knew nothing about McClinton or any threat he faced at Phillips before the murder (R. 46-7), whether it should have been obvious to him or not.  On the other hand, the issue with every other Defendant is whether they should have passed along the knowledge which they did possess according to direct evidence in the record, while the evidence of Berry's knowledge is purely circumstantial.

the procedures outlined in GDC's policy on intake and orientation." (R. 55 at 9-10; R. 52-1 at 16-17, ¶¶62-63). Given that the obvious purpose of those procedures was to maintain a safe and secure environment, the failure to follow them had the foreseeable consequence of jeopardizing safety and security and – in the case of an inmate who had spent the last four months in protective custody – costing a human life. Primus' entire interaction with McClinton "couldn't have been no more than a minute or two." (R. 55 at 14). Based on Mr. Eichenlaub's experience in the federal system, that was insufficient time for "assessing whether there is an offender or group of offenders who might harm the newly arrived offender," in which case "[i]f the staff member determines there is a threat to the offender's safety, the offender can be placed in Administrative Detention until an appropriate location for the offender can be identified. No such procedure was followed for Mr. McClinton and he was placed in Baldwin State Prison's general population where he was vulnerable." (R. 52 at 15-16, ¶69).

**E. There is a jury question as to whether a lieutenant in charge of security at Baldwin State Prison was deliberately indifferent to a serious risk of harm when she was aware of requests by the decedent to be placed in protective custody there but failed to take appropriate action on those requests, which she admittedly failed to document, as well as a credibility issue as to her claim that she took no action because the decedent withdrew those requests and the decedent is not alive to refute that claim.**

Just one day after his woefully deficient orientation at Baldwin which "couldn't have been no more than a minute or two" (R. 55 at 14), McClinton was

clearly in distress when he 'put himself on the door' and told an officer that "I got to get out of the dorm [because] I did something to an offender at another institution." (R. 59 at 7). That officer, Krystle Milner – who is not a Defendant because she followed proper procedure – sent McClinton and his property to see her supervisor, Defendant Nolita Moss. But Lt. Moss, while admitting that she *did* have reason to fear for McClinton's safety based on what he told her, failed to document the encounter as required by policy. (R. 52-1 at 18-19, ¶¶68-69, citing Moss's recorded statement to internal investigators; R. 58 at 21). Her admission that she feared for McClinton's safety should preclude any finding as a matter of law that she no longer had that fear a few hours later based on her self-serving, undocumented recollection of what a now deceased convicted felon allegedly told her – the credibility of which is solely a question for the jury.

Despite knowing that policy required her to document McClinton's request for protective custody, Lt. Moss admits that she failed to do so – after which he allegedly changed his mind and told her he no longer wanted protective custody, which she also admits she failed to document even though she knew she was required to document that as well. "According to Lieutenant Moss's testimony, an offender who declines or refuses protective custody must provide a written statement," but Moss failed to obtain a statement documenting either the request or its alleged withdrawal. (R. 52-1 at 19, ¶72; R. 58 at 21). On summary judgment,

Plaintiffs/Appellants are entitled to a favorable inference from her failure to follow policy and the complete lack of required documentation to support or rebut her one-sided account.

Jamari McClinton is no longer alive, so he cannot tell his side of that story. Nevertheless, on summary judgment the facts must still be construed in his favor, and if Lt. Moss admits he requested protective custody but also insists he withdrew that request, and that she failed to document either, reasonable jurors could infer that she knew he needed protective custody based on the information that she admittedly possessed. Indeed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case" once a jury performs its role. *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (citing *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009)).

In any event, as Warden Perry made clear in his deposition, the inmates do not get to decide their housing assignment and it is not up to them to decide whether they need protective custody. (R. 60 at 16, 19, 45). They are not the ones in charge. In fact, Perry had "put him in *involuntary* protective custody and I never took him off of involuntary protective custody" during his last four months at Phillips. (*Id.* at 10).

According to the former #2 official at the Bureau of Prisons,

> Based on my experience, Lieutenant Moss failed to act reasonably when she became aware of Mr. McClinton's request for protective custody.  Even if Mr. McClinton told her he wished to return to his housing unit, Lieutenant Moss was obligated to investigate threats to his safety at Baldwin State Prison.  Instead, she did not take any action to investigate his need for protective custody.

(R. 52-1 at 19, ¶73; R. 52-2 at 1-2). "**Lieutenant Moss had knowledge of a threat to Mr. McClinton's safety and she failed to act reasonably to protect him.**" (R. 52-1 at 19, ¶69) (emphasis added because of its close parallel to the language of *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). Without testifying to the ultimate legal standard, that factual conclusion from Eichenlaub's expert – which is repeated multiple times about multiple Defendants – is fully consistent with the definition of deliberate indifference. Eichenlaub further opines that "[i]n the absence of appropriate intervention by Lieutenant Moss, Mr. McClinton returned to his housing unit sometime after 6:00 p.m. according to Officer Milner.  Mr. McClinton was stabbed to death the next morning at approximately 8:00 a.m." (*Id.* at 20, ¶74).

Based on Eichenlaub's testimony and their own understanding of the evidence, reasonable jurors could conclude that Lt. Moss had actual knowledge of a threat to Mr. McClinton's safety, but she failed to act reasonably on that knowledge despite the obvious bad consequences that could result from her inaction. (R. 52-1 at 19, ¶69).  Causation can be inferred from the fact that McClinton was murdered just hours later.  (*Id.* at p. 20, ¶74).  That clearly satisfies

the definition of deliberate indifference under both *Farmer* and *Wade*.

**F. The trial court erred by declining to apply a Georgia statute tolling the limitations period for personal injury claims to a federal civil rights claim for wrongful death, and the Court should certify the interpretation of that statute (O.C.G.A. §9-3-99) to the Supreme Court of Georgia.**

In addition to appealing the trial court's grant of summary judgment to all Defendants on all claims (R. 63), Appellants have also appealed the trial court's previous Order on their motion to amend – which allowed the estate of Jamari McClinton to assert its claims against Defendants who were added after the expiration of the statute of limitations, but it did not allow Jamari's parents to assert their claims for wrongful death against the newly added Defendants. (R. 50). Appellants submit that both claims should be allowed to go forward under state law tolling provisions which are applicable under Section 1983, and in the event that the trial court Order on summary judgment is reversed in full or in part, this Court is being asked to allow the McClinton family's wrongful death claims to go forward against the remaining Defendants now that the trial court's interlocutory Order on that issue is ripe for appeal.

Since there is no federal statute of limitations applicable to Section 1983 claims, the Supreme Court has repeatedly held that limitations periods and tolling provisions applicable thereto are determined by state law requirements for generic personal injury claims – even if the alleged misconduct resulted in a deprivation of

life, property, or liberty and not a personal injury *per se*. *Wilson v. Garcia*, 471 U.S. 261 (1985); *see also Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Owens v. Okure*, 488 U.S. 235, 249-250 (1989). The Eleventh Circuit has held made clear that "the proper limitations period for all section 1983 claims in Georgia is the two-year period set forth in O.C.G.A. §9-3-33 for personal injuries." *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986); *see also Johnson v. Bd. of Regents,* No. 5:06-cv-366 (WLS), 2007 U.S. Dist. LEXIS 71983, at *6 (M.D. Ga. Sep. 27, 2007) (applying two-year Georgia personal injury statute to federal disability claims).

Along with the limitations period, federal law also borrows state law on "closely related questions of tolling and application" of that period. *Wilson*, 471 U.S. at 269; *Bd. of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 484-86 (1980). For instance, district courts in Georgia have borrowed and applied the tolling rule contained in O.C.G.A. §9-3-99, which is one of the tolling provisions relied upon by Plaintiffs in this case. *Shaw v. Peach Cty.*, No. 5:21-cv-00145-TES, 2021 U.S. Dist. LEXIS 175088, at *17 (M.D. Ga. Sep. 15, 2021); *Benjamin v. Thomas*, No. 1:16-cv-1632-WSD, 2016 U.S. Dist. LEXIS 132575, at *18 (N.D. Ga. Sep. 27, 2016).

The fact that Plaintiffs have sued in both their capacity as parents of Jamari McClinton and as co-administrators of his estate is consistent with Eleventh Circuit

precedent that gives them standing to sue in both capacities. In *Brazier v. Cherry*, 293 F.2d 401, 403-04 (5th Cir. 1961), the former Fifth Circuit held that the widow of a man beaten to death by Georgia police officers had standing to bring Section 1983 claims both as the statutory wrongful-death beneficiary under Georgia law and as administratrix of his estate. *See also Carringer v. Rodgers*, 331 F.3d 844, 847-848 (2003) (same holding as to Section 1983 claims by mother of deceased son). The Eleventh Circuit has made clear that the "incorporation of Georgia's wrongful death statute [in *Brazier*] was not done in response to a violation of the [survivor's] rights: it was done to remedy the violation of the *decedent's* rights." *Robertson v. Hecksel*, 420 F.3d 1254, 1261 (11th Cir. 2005).   Because Jamari McClinton himself could have sued for the violation of his rights had he survived the assault, the Section 1983 claim is his to bring and any tolling provision that extends the deadline for him or his personal representative to bring such a claim applies not only to his state law claims for medical expenses and pain and suffering, but also to his federal claim for the violation of his constitutional rights).

Accordingly, the two-year limitation for garden-variety personal injury cases – as well as any tolling provision applicable to that deadline in personal injury cases – applies to claims for the violation of federal rights under Section 1983 cases.   There are two tolling provisions applicable to personal injury cases under Georgia law that extend the time for the filing of claims in this case, and there is no

dispute as to one of them:  where a claim is brought by or against a decedent's estate – including but not limited to a claim for personal injury, irrespective of whether the injury being sued for had any relationship to the decedent's death, and irrespective of whether the claim is being brought on behalf of the estate for an injury to a now deceased claimant or being brought against the estate for damages owed by a now deceased defendant.  O.C.G.A. §9-3-92 (tolling the statute for all claims brought by or against an estate for up to five years until an administrator is appointed). The trial court agreed that this tolling provision applied to the estate's claim and allowed the addition of the new parties for purposes of that claim.

The matter in dispute on this appeal is a separate tolling provision for claims brought by victims of crime in which there is a criminal prosecution, under which the statute of limitations does not begin to run until the criminal prosecution is over. O.C.G.A. §9-3-99.[6]  That tolling provision applies to lawsuits brought against any defendant, and not just against the perpetrator of the crime or any other subset of defendants. *Harrison v. McAfee*, 338 Ga. App. 393, 388 S.E. 2d 872 (2016). While there is a Georgia Court of Appeals decision *under state law* holding that this tolling provision only applies to personal injury cases and not wrongful death under a strict construction of the statutory language, it is doubtful that the Legislature intended to

---

[6] It is undisputed that the criminal prosecution in this case was still pending when the motion to amend was filed. (Doc. 29-4).  There is no statute of limitations for murder and it is not unusual for murder prosecutions to last longer than the two year limitations period for filing of a wrongful death lawsuit.

give victims of traffic violations the benefit of tolling but not murder victims. *Hicks v. Universal Health Services, Inc.*, 364 Ga. App. 769, 874 S.E. 2d 877 (2022). Why do whiplash victims get the benefit of a tolling provision for the relatively short time it takes for a traffic citation to be disposed of in traffic court, but the family of a murder victim can be kept completely in the dark about an ongoing homicide investigation that may take years to complete *without* being afforded an extension of the limitations period until they know who to sue for what? It certainly seems more logical to construe the statute as applying to either crime victims *or* anyone standing in their shoes.

*Hicks*, however, was a decision by one panel of an intermediate state appellate court on an issue of state law that the Georgia Supreme Court has not yet addressed. Because the state Supreme Court is the ultimate authority on the construction of state law, Appellants have filed a motion herewith asking this Court to certify the issue to the Supreme Court in the hope that it will overrule the Georgia Court of Appeals decision in *Hicks*.

But at the same time, Appellants do not believe that the state courts' interpretation of O.C.G.A. §9-3-99 ought to be controlling if that interpretation conflicts with the remedial purpose of Section 1983, where the only relevance of state law is to provide a deadline for the assertion of rights that are governed by federal rather than state law. Under the Supreme Court and Eleventh Circuit

authority cited above, Section 1983 simply borrows the statute of limitations and applicable tolling provisions for generic *personal injury* claims – not wrongful death claims.  Under that view, the intermediate appellate court decision in *Hicks* has no bearing on what claims can be brought under Section 1983 because it was not a question of what the deadline was for a generic personal injury claim.  *Hicks* involved a state law based wrongful death action, and Section 1983 does not borrow limitations from the law of wrongful death but from the law applicable to generic personal injury actions.  Accordingly, any tolling provision that extends the statute for plaintiffs in the typical personal injury case also applies across the board to all Section 1983 claims, irrespective of whether the constitutional violation resulted in a death or not.  If the Court agrees with Appellants' position on that point, then there is no need to seek a ruling from the Georgia Supreme Court, but if this Court's ruling depends upon a substantive determination of what a Georgia statute means, that should come from the Supreme Court on an issue certified by this Court.

Because Plaintiffs/Appellants' Section 1983 claims were tolled by both statutes for the benefit of both the estate and wrongful death claims, the trial court erred by denying the motion to amend as to both, and said interlocutory Order (R. 50) should be reversed and the case should proceed to trial on both the estate and wrongful death claims against all Defendants remaining in the case after this appeal.

## **CONCLUSION**

For the reasons set forth in the foregoing argument of law and citation of authority, Appellants request that the judgment of the trial court be reversed.

Respectfully submitted this 12th day of March, 2025.

*/s/Craig T. Jones*
CRAIG T. JONES
Attorney for Appellant
Georgia Bar No. 399476

CRAIG T. JONES, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com


## **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing Brief of Appellants complies with the 13,000-word limit set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by 11th Cir. Rule 32-4. From the caption reading "Statement Regarding Oral Argument" to the last sentence of the "Conclusion," this Brief contains exactly 9,461 words according to Microsoft Word's word-count function, printed in Times New Roman 14-point typeface.

/s/ Craig T. Jones
Craig T. Jones
Ga. Bar No. 399476
Attorney for Appellants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I served the foregoing Brief of Appellant upon the following counsel via First Class U.S. Mail and the Court's efiling system:

William W. Peters, Esq.
Assistant Attorney General
State Law Department
40 Capitol Square, SW
Atlanta, GA 30334

This 12th day of March, 2025.

*/s/ Craig T. Jones*
CRAIG T. JONES
Ga. Bar No. 399476
Counsel for Appellants