**FOR PUBLICATION**

# In the
# United States Court of Appeals
## For the Eleventh Circuit

---

No. 25-10654

---

RICARDO MCCLINTON,

Surviving Parents and Co-Administrators of the Estate of deceased Jamari McClinton,

DORIS JONES,

Surviving Parents and Co-Administrators of the Estate of deceased Jamari McClinton,

*Plaintiffs-Appellants,*

*versus*

WARDEN, BALDWIN STATE PRISON,

COUNSELOR JARVIS PRIMUS,

Baldwin State Prison,

WARDEN, PHILLIPS STATE PRISON,

ELADIO ABREU,

NOLITA MOSS,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:22-cv-00109-MTT

Before BRANCH, LUCK, Circuit Judges, and SCHLESINGER,* District Judge.

BRANCH, Circuit Judge:

While Jamari McClinton was incarcerated in Phillips State Prison in Georgia ("Phillips"), he stabbed a high-ranking member of the Bloods criminal gang during an altercation. Thereafter, the warden of Phillips placed McClinton in protective custody and requested McClinton's transfer to another prison for his protection. The transfer was approved, and McClinton was sent to Baldwin State Prison ("Baldwin"). After arriving at Baldwin, McClinton was placed in the general prison population where another prisoner, a Bloods member, later stabbed him to death.

McClinton's parents and estate (the "plaintiffs") sued five officials in the Georgia Department of Corrections ("GDOC") alleging that each violated the Eighth Amendment's prohibition of cruel and unusual punishments. They alleged each official was deliberately indifferent to the risk that McClinton faced at Baldwin by failing to ensure that McClinton was properly protected upon his transfer.

* Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

The district court granted the defendants' motion for summary judgment and dismissed each claim. The district court found that each defendant was entitled to qualified immunity because the defendants did not violate any clearly established law.

On appeal, the plaintiffs argue that the district court misconstrued this Court's *en banc* precedent in *Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (*en banc*). Per the plaintiffs, the district court applied a higher standard for determining whether the defendants were deliberately indifferent than that required by *Wade* and by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). By applying the proper standard, they argue, material disputes of fact remain as to each defendant, and this Court should therefore reverse the district court in full. Some defendants argue, however, that they did not know of the risk to McClinton at Baldwin; and the rest argue that, although generally aware that McClinton faced danger, they were not subjectively aware that their conduct caused him a substantial risk of harm.

After careful review, and with the benefit of oral argument, we affirm, because none of the defendants possessed the requisite subjective knowledge of the risk of harm to McClinton.[1]

---

[1] The parents also challenge the district court's dismissal of their claims against three defendants—Perry, Abreu, and Moss—as time-barred by the relevant statute of limitations. We need not reach these arguments because our conclusion on the merits that each of the defendants is protected by qualified immunity as to the timely claims is equally applicable to the parents' time-

## I. BACKGROUND

### *A. Factual Background*[2]

On April 19, 2021, McClinton, an inmate in Phillips, stabbed Michael Johnson, another inmate. At the time of the stabbing, Johnson was a high-ranking member of the Bloods, a notorious prison gang. After the stabbing, Warden James Perry placed McClinton in protective custody to protect him from retaliation by Johnson or another Bloods gang member. Warden Perry also began the process to have McClinton transferred to another prison to more permanently separate him from Johnson. The transfer request stated, "[P]lease transfer inmate McClinton to a facility with [mental health] level 3 services. He cannot come out on the compound because of a known enemy. The enemy is identified as Johnson, Michael GDC#1000386449, a high-ranking Blood member whom inmate McClinton assaulted with a weapon." McClinton remained in protective custody until his transfer.

Classification analyst Eladio Abreu—who worked for GDOC's central office rather than any specific prison—reviewed the transfer request and approved McClinton's transfer to Baldwin. Baldwin possessed a mental health level III facility capable of accommodating McClinton's needs, and Abreu also believed that

---

barred claims. As such, the parents' motion for certification of the statute of limitations issue to the Supreme Court of Georgia is denied as moot.

[2] The facts recited below are either undisputed or construed in the light most favorable to plaintiffs as the non-moving party. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam).

transferring McClinton to Baldwin would allow McClinton to no longer be housed in protective custody. According to Abreu, he had no knowledge that transferring McClinton to Baldwin would cause any risk of harm to McClinton.[3] Abreu's approval of McClinton's transfer was the extent of his involvement in the relevant events.

McClinton was transferred to Baldwin on August 6, 2021, where he was housed in a general population dorm rather than in protective custody. After the transfer, Baldwin counselor Jarvis Primus conducted an intake interview with McClinton. During the interview, McClinton did not tell Primus about any safety concerns he had and provided no information about his altercation with Johnson at Phillips. Primus was not informed that McClinton had been in protective custody at Phillips nor of any threat of harm McClinton might have faced from any of the prisoners housed at Baldwin.[4] Primus had no further interactions with McClinton after the interview. There is no evidence that Primus saw Warden Perry's transfer request for McClinton.

---

[3] The plaintiffs conceded Abreu's lack of knowledge, although they asserted that he had a "duty to address" the issues regarding McClinton's conflict with the Bloods gang.

[4] The plaintiffs did not dispute that Primus lacked actual knowledge, although they asserted that "this information was []available in the transfer documentation, plus a proper intake and review of history would have produced such knowledge."

On August 9 or 10, 2021, McClinton knocked on the door of his housing unit and pushed past Krystle Milner, a corrections officer at Baldwin, telling her that he needed to leave his assigned dormitory. Milner testified that McClinton said, "I got to get out of the dorm. I did something to an offender at another institution, and we're in the same dorm together." Milner contacted her supervisor, Lieutenant Nolita Moss, who told Milner to send McClinton to security. Milner did not tell Moss why McClinton wanted to leave his dorm.

Moss met with McClinton after Milner sent him to security. During the meeting, McClinton told Moss that he wanted to be placed in protective custody, but at no point did he tell Moss why he wanted to be placed there. Later the same day, McClinton withdrew his request for protective custody and said that he wanted to return to his assigned dorm. Based on McClinton's decision to withdraw his request, Moss believed that McClinton would not be in danger in his dorm, so she allowed him to return there.[5] There is no evidence that Moss saw McClinton's transfer request.

On August 11, 2021, McClinton was stabbed to death by another Baldwin inmate. According to an incident report, McClinton's alleged killer was a member of the Bloods gang.

[5] The plaintiffs do not dispute Moss's account of her interactions with McClinton, although they assert they might have been able to prove otherwise if Moss had "take[n] the required written statement or otherwise document[ed] the request."

The warden of Baldwin while McClinton was housed there was Walter Berry. Berry had no interactions with McClinton while he was at Baldwin, nor is there any evidence that he was aware of any of the events involving McClinton at Phillips or at Baldwin before McClinton's death.

### *B. Procedural History*

On March 14, 2022, McClinton's parents, Ricardo McClinton and Doris Jones, filed a wrongful death suit against Berry and Primus on their own behalf. They alleged that Berry and Primus each failed to protect McClinton, in violation of the Eighth Amendment, by being deliberately indifferent to a substantial risk of harm against McClinton—namely, the danger of lethal retaliation. All proceedings in this suit were stayed while criminal proceedings against McClinton's alleged killer were ongoing.

On April 8, 2024, the parents amended their complaint. First, the amended complaint added three new defendants—Perry, Abreu, and Moss—and brought similar wrongful death claims on the parents' behalf alleging that the new defendants also failed to protect McClinton in violation of the Eighth Amendment. Second, the amended complaint added Eighth Amendment failure to protect claims on behalf of McClinton's estate against all five defendants.

The three new defendants moved to dismiss the claims against them, which the district court granted in part and denied in part. The district court found that the wrongful death claims brought by the parents on their own behalf were time-barred by

the applicable statute of limitations, and that no tolling provisions applied to the parents' own claims. However, the district court allowed the estate's claims against the three new defendants to proceed (along with the original claims against Berry and Primus).

The district court later granted the defendants summary judgment on the plaintiffs' remaining claims, finding that each of the defendants was protected by qualified immunity. The plaintiffs could not prevail on the deliberate indifference claim because the plaintiffs presented no evidence tending to show that any defendant was actually aware that his or her own conduct caused a substantial risk of serious harm to McClinton. And the plaintiffs presented no clearly established law that the defendants' actions had violated.

This appeal followed.

## II. STANDARD OF REVIEW

We review the district court's grant of a motion to dismiss and its grant of summary judgment *de novo*. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (*per curiam*). For purposes of the motion to dismiss, we "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to" the non-moving party. *Id.* In the summary judgment context, we also draw all factual inferences in the light most favorable to the non-moving party. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017). Summary judgment is appropriate only if there is no genuine issue of material fact. *Id.*

## III. DISCUSSION

The defendants argue that qualified immunity defeats the plaintiffs' Eighth Amendment claims. Qualified immunity protects government officials from personal liability for their official conduct so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* at 1346 (quotation omitted).

Once the official makes that showing, then the burden shifts to the plaintiff to prove that qualified immunity does not apply. *Id.* Specifically, a plaintiff must prove two things: "that the defendant violated a constitutional right" and that the right was "clearly established." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quotations omitted). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The "'salient question' . . . is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional." *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, the parties do not dispute that the defendants acted within the scope of their discretionary authority. Their dispute

turns on whether the defendants' actions (and failures to act) violated clearly established Eighth Amendment law governing failure to protect claims.

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. As we explained in *Wade*, to establish liability on an Eighth Amendment "deliberate indifference" claim, a plaintiff must satisfy both an objective and a subjective element. First, he must "demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious"; and second,

> the plaintiff must demonstrate that the defendant acted with subjective recklessness as used in the criminal law, and to do that he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable under the Cruel and Unusual Punishments Clause if he responded reasonably to the risk.

*Wade*, 106 F.4th at 1262 (quotations omitted).[6]

---

[6] Plaintiffs argue that "*Wade* is best understood as a judicial housekeeping decision intended to resolve a semantic split in authority," and that it is consistent with a "two-part standard for deliberate indifference—one part

Beginning with the objective element, there is no dispute that housing McClinton—who had recently stabbed a high-ranking Bloods gang member—in a general population cell block with Bloods members was an objectively serious deprivation because it was a condition posing a substantial risk that McClinton would suffer serious harm—being severely wounded or killed. The heart of this challenge is therefore situated in the subjective element of the plaintiffs' cruel and unusual punishment claim, to which we now turn. Specifically, we must determine whether each defendant was subjectively aware that his or her actions (or

---

subjective . . . and one part objective." Both arguments are incorrect. First, *Wade* resolved a substantive, not semantic, intra-circuit split concerning the requisite standard of negligence—more than gross negligence versus more than mere negligence—by expressly "repudiat[ing] our dueling 'more than' formulations'" and returning to the Supreme Court's standard in *Farmer*. *Wade*, 106 F.4th at 1255.

Second, the plaintiffs' argument misstates what "deliberate indifference" refers to. While an Eighth Amendment cruel and unusual punishment claim has two elements, a subjective and an objective element, deliberate indifference refers only to the subjective element. As the Supreme Court explained in *Farmer*, "[t]he second requirement [of a cruel and unusual punishment claim is that] a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (quotation omitted); *see also id*. at 846 (describing "deliberate indifference" as "the subjective factor"). Given this language in *Farmer*, we did not endorse in *Wade* a mixed objective-subjective analysis for deliberate indifference. Instead, as in *Farmer*, we articulated a purely subjective deliberate indifference standard of "subjective recklessness as used in the criminal law." *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 839).

inaction) caused a substantial risk of serious harm to McClinton—and, if so, whether he or she responded reasonably.

This Court in *Wade* explained that plaintiffs making deliberate indifference claims—like those at issue here—"must show that the defendant acted with 'subjective recklessness as used in the criminal law.'" 106 F.4th at 1253 (quoting *Farmer*, 511 U.S. at 839). To make such a showing, "the plaintiff must demonstrate that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." *Id.* And this showing of subjective recklessness must be based on more than a generalized or abstract knowledge of a danger to the prisoner; the official must be aware of a specific risk. That an official must know of a specific risk is clear from *Farmer*, where the Supreme Court's focus "was on whether the official knew that . . . his own acts or omissions . . . put the inmate at risk, not just whether the inmate confronted a risk in the abstract." *Id.* at 1259; *see also Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) ("In general, a plaintiff must show more than a generalized awareness of risk to make out a deliberate-indifference claim." (quotation omitted)).

Put simply, a constitutional violation occurs only when prison officials act "consciously" such that their acts or omissions knowingly have the effect of inflicting a punishment upon prisoners. *Farmer*, 511 U.S. at 839; *see also id.* at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'") This focus on the

prison official's actual "mental attitude" "isolates those who inflict punishment" from those who do not, ensuring that "only inflictions of punishment carry liability." *Id.* at 839, 841. Put differently, without "a particularized focus on a prison official's subjective awareness of the risk created by his own conduct, there is a danger that he could be held liable for conduct that does not remotely resemble the infliction of punishment." *Wade*, 106 F.4th at 1259 (alteration adopted) (quotation omitted). Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

We now turn to applying this law to each of the individual defendants.

1. Warden Perry (Phillips)

The plaintiffs argue that Perry's "fail[ure] to communicate [to Warden Berry] that [McClinton] had been in protective custody for four months when transferring him to Baldwin" constitutes deliberate indifference to a substantial risk of serious harm to McClinton.

Perry admits that he knew of the risk of harm to McClinton from gang retaliation, an admission supported by his decision to promptly place McClinton in protective custody and to transfer McClinton out of Phillips "to a facility with [mental health] level 3 services." But he responded reasonably to that known risk by placing McClinton in protective custody and seeking a transfer, and

thus Perry "cannot be found liable under the Cruel and Unusual Punishments Clause" for his knowledge of the risk to McClinton at Phillips. *Wade*, 106 F.4th at 1262 (quotation omitted). As to McClinton's experiences at Baldwin after his transfer, the plaintiffs have pointed to no evidence that Perry was subjectively aware that his decision to transfer McClinton to another facility would place McClinton at risk of serious harm.

Nevertheless, the plaintiffs argue that Perry's duty was to "reach out to the warden at the receiving facility" when "he [was] aware of a threat" like the one against McClinton. But they cite no caselaw establishing that this duty exists; and even if the plaintiffs were to show that Perry had such a duty and that he failed to meet it, such a showing of negligence is not enough. Instead, the plaintiffs must show that Perry *knew* that not reaching out would endanger McClinton. As we explained in *Goodman v. Kimbrough*, "[p]roof of deliberate indifference requires a great deal more than does proof of negligence" as "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 718 F.3d 1325, 1332 (11th Cir. 2013) (emphasis omitted) (quotation omitted); *see also Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). As the plaintiffs present no evidence connecting Perry's general understanding of the risk to McClinton at Phillips to any subjective knowledge that failure to reach out to the prison administration at Baldwin would

endanger McClinton there, we cannot conclude that Perry was deliberately indifferent to a risk of harm to McClinton.

A defendant-official is entitled to qualified immunity if a plaintiff cannot establish that the defendant committed a constitutional violation. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). As Perry was not deliberately indifferent, he did not violate McClinton's Eighth Amendment right. Thus, Perry is protected by qualified immunity.

2. GDOC Analyst Abreu

The plaintiffs argue that Abreu was deliberately indifferent because "he failed to take steps to continue protective custody or otherwise ensure the safety of the decedent upon arrival at Baldwin." Instead, they claim that Abreu should have "coordinate[d] with the security staff at Baldwin."

As with Perry, Abreu had some knowledge of the risk McClinton faced. In approving McClinton's transfer, Abreu reviewed the transfer request from Phillips, which included the information that McClinton was in danger from "a known enemy" who was "Johnson, Michael . . . , a high-ranking Blood member." The transfer order was silent as to any known risks beyond the walls of Phillips, otherwise stating only that McClinton needed to be transferred "to a facility with [mental health] level 3 services."

The plaintiffs have conceded that Abreu had no knowledge that transferring McClinton to Baldwin would cause any risk of harm to McClinton. The transfer request Abreu reviewed makes clear that McClinton faced a risk at Phillips, without any mention

that he may face a risk once he was transferred elsewhere. Nor do the plaintiffs provide facts showing that Abreu somehow learned that McClinton would be at risk if he approved a transfer to Baldwin. Without actual knowledge that sending McClinton to Baldwin could endanger him, Abreu cannot be found to have been deliberately indifferent. *Wade*, 106 F.4th at 1253.

As Abreu was not deliberately indifferent, he did not violate McClinton's Eighth Amendment right. Therefore, Abreu is protected by qualified immunity.

3. Warden Berry (Baldwin)

The plaintiffs argue that Berry was deliberately indifferent because he "fail[ed] to make arrangements to continue the protective custody that [McClinton] had been on at Phillips." In other words, they claim that Berry had a duty to inform himself of the security risks McClinton faced upon his transfer to Baldwin but failed to do so.

It is undisputed that Berry had no knowledge of McClinton at all, let alone of any substantial risk he faced of retaliation. Berry's lack of knowledge is fatal to the plaintiffs' claim, because deliberate indifference requires that the defendant be subjectively aware that his conduct caused a substantial risk of serious harm to the plaintiff. *Id.* As with their argument regarding Perry, the plaintiffs' theory incorrectly applies a negligence standard, when we have adopted the higher standard of "subjective recklessness as used in the criminal law." *Wade*, 106 F.4th at 1262 (quotation omitted). As the Supreme Court noted in *Farmer*, "we cannot accept petitioner's

argument . . . that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it." 511 U.S. at 841–42.

Therefore, as Berry was not deliberately indifferent, he did not violate McClinton's Eighth Amendment right and is protected by qualified immunity.

4. Counselor Primus

The plaintiffs argue that Primus failed to properly conduct his intake interview with McClinton, which, if done properly, would have uncovered information about the risks McClinton faced. Primus is entitled to qualified immunity for the same reason as Berry: the parties do not dispute that he had no knowledge of any risk to McClinton. As with Perry and Berry, the plaintiffs' argument instead invokes a negligence standard, premised on a violation of a duty owed to McClinton, that is out of place in the deliberate indifference context. *Wade*, 106 F.4th at 1262. Without actual knowledge, Primus was not deliberately indifferent, he did not violate McClinton's constitutional right, and he is protected by qualified immunity.

5. Lieutenant Moss

Finally, we turn to Moss. The plaintiffs argue that Moss was deliberately indifferent because "she was aware of requests by [McClinton] to be placed in protective custody but failed to take appropriate action on those requests." Put simply, they claim that

"she failed to act reasonably on [her] knowledge" of threats to McClinton's safety.

Moss similarly lacked knowledge that McClinton was facing a threat of substantial harm. Although McClinton had told Officer Milner that he needed to be removed from his assigned dorm because "[he] did something to an offender at another institution, and we're in the same dorm together," we have no evidence that Milner communicated information about the source of the threat to Moss. When Moss met with McClinton, he told her only that he wanted protective custody, not why he wanted it. Once he ultimately requested to be returned to his bunk, Moss agreed to send him back because she did not believe, based on the information before her, that he would be in danger. These facts fall far short of subjective knowledge that her decision to send McClinton back into the general population dorm would place him at substantial risk of serious harm. *Id.* at 1253.

The plaintiffs nevertheless argue that Moss violated McClinton's rights because she failed to respond reasonably: that she had knowledge of a threat to McClinton's safety and did not investigate the threat or act to protect him in any way. This argument stretches the evidence beyond what it will support. To be sure, Moss knew that McClinton was requesting protective custody. But without any evidence that she had *specific* knowledge of a particular risk to McClinton—rather than a mere "generalized awareness of risk" to him, *Marbury*, 936 F.3d at 1234—we cannot infer from a withdrawn request for protective custody that Moss

knew that returning McClinton to his dorm placed him in harm's way. Any awareness of "risk in the abstract" to McClinton based solely on his vague request for protective custody is insufficient for Eighth Amendment liability. *Wade*, 106 F.4th at 1259.

Nor did Moss's failure to investigate lead to a violation of McClinton's rights. As we noted earlier, even "if the risk was obvious and a reasonable prison official would have noticed it," *Farmer*, 511 U.S. at 842, the mere obviousness of the risk is not enough to find an official liable because "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Goodman*, 718 F.3d at 1332 (emphasis omitted) (quotation omitted). Further, the evidence plainly shows that she did not subjectively believe that he was in serious danger, and thus her mental state did not constitute deliberate indifference. *See Farmer*, 511 U.S. at 838.

Thus, without evidence that she actually knew that sending McClinton back into general population endangered him, we cannot find that Moss was deliberately indifferent to the abstract risk she was alerted to, and thus she did not violate McClinton's constitutional right. Moss is therefore protected from liability by qualified immunity.

## IV. CONCLUSION

In accordance with our analysis above, the plaintiffs have not presented any evidence from which a jury could conclude that any of the defendants were deliberately indifferent to the risk of

significant harm faced by McClinton. The judgment of the district court is therefore

**AFFIRMED.**